UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SONDREA MILLER, individually and as independent administrator of, and on behalf of the ESTATE OF JAVONTE LAKENDRICK MYERS, and JAVONTE LAKENDRICK MYERS's heir(s)-at-law, | § § § § § § | |
| Plaintiff, | § § | CIVIL ACTION NO. _____ |
| v. | § § | JURY DEMANDED |
| TARRANT COUNTY, TEXAS; ERIC L. GAY; and DARIEN A. KIRK, | § § § § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

> **This is a case of a tragic pre-trial inmate death resulting from violation of constitutional rights. Defendants' deliberate indifference, objective unreasonableness, and policies, practices, and/or customs caused Javonte Myers' suffering and death.**



Table of Contents

I.   Introductory Allegations ...................................................................................4

   A.   Parties.................................................................................................4

   B.   Jurisdiction and Venue .......................................................................6

II.   Factual Allegations ........................................................................................6

   A.   Introduction........................................................................................6

   B.   Javonte Myers ....................................................................................7

   C.   Javonte's Death Resulting from Incarceration in the Tarrant County Jail.......7

     1.   Witness Statements ..................................................................8

       a.   Esparza, Robert - Jailer .................................................9

       b.   Gay, Erik - Jailer .........................................................12

       c.   Kirk, Darien – Jailer ....................................................17

       d.   Schuppert, Troy - Jailer................................................20

     2.   Tarrant County Sheriff Records ...............................................25

     3.   Medical Records / Death Reports .............................................25

       a.   EMT Records ................................................................25

       b.   Autopsy Report ............................................................26

       c.   Custodial Death Report (Filed with Attorney General)...........26

       d.   Inmate Death Report (Filed with Texas Commission on Jail Standards) ..........27

   D.   Investigations ...................................................................................27

     1.   Texas Rangers .......................................................................27

     2.   Texas Commission on Jail Standards ........................................29

   E.   *Monell* Liability of Tarrant County....................................................29

     1.   Introduction...........................................................................29

     2.   Tarrant County Policies, Practices, and Customs ...............................30

     3.   TCJS Records Demonstrating County Practices and/or Customs .......33

     4.   Tarrant County Jail Suffering and Death Show a Custom and Pattern of Indifference ..........38

III.   Causes of Action ........................................................................................50

   A.   14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* .....................50

   B.   Remedies for Violation of Constitutional Rights.............................................51

C.      Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of Constitutional Rights ............................................................52

D.      Cause of Action Against Tarrant County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights ...................................................................55

IV.     Concluding Allegations and Prayer ...........................................................................58

A.      Conditions Precedent ......................................................................................58

B.      Use of Documents at Trial or Pretrial Proceedings .......................................58

C.      Jury Demand ...................................................................................................58

D.      Prayer .............................................................................................................58

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff files this complaint and for cause of action will show the following.

I.      Introductory Allegations

        A.      Parties

1.      Plaintiff Sondrea Miller ("Sondrea Miller" or "Ms. Miller") is a natural person who resides and is domiciled in Texas.  Sondrea Miller was Javonte Lakendrick Myers' legal and biological mother.  Javonte Myers is referred to herein at times as "Mr. Myers," "Javonte," or the "decedent."  Sondrea Miller sues in her individual capacity and as the independent administrator of the Estate of Javonte Lakendrick Myers, Deceased.  Sondrea Miller, when asserting claims in this lawsuit as the independent administrator, does so in that capacity on behalf of her and any other wrongful death beneficiaries (including her), and she seeks all wrongful death damages available to those person(s).  She also sues in that capacity asserting claims on behalf of the estate and all of Javonte's heirs (including her, KaKeshia Black [decedent's adult half-sister], Jaquentes Myers [decedent's adult brother], and Joshua Myers [decedent's adult half-brother]).  All people in the immediately preceding sentence are collectively referred to herein as the "Claimant Heirs." Sondrea Miller asserts claims on behalf of and seeks all survival damages and wrongful death damages available to Claimant Heirs.  Sondrea Miller also sues in her individual capacity and seeks all wrongful death damages available to her.  Letters of Independent Administration were or will be issued to Sondrea Miller on or about March 23, 2022, in Cause Number 2021-PR02413-1, in the Probate Court No. 1 of Tarrant County, Texas, in a case styled *Estate of Javonte Lakendrick Myers, Deceased.*

2.      Defendant Tarrant County, Texas ("Tarrant County" or the "County") is a Texas county.  Tarrant County may be served with process pursuant to Federal Rule of Civil Procedure

4(j)(2) by serving its chief executive officer, Honorable County Judge Glen B. Whitley, at 100 East Weatherford Street, Fort Worth, Texas 76196, or wherever Honorable County Judge Glen B. Whitley may be found.  Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a).  The County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under color of state law at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983).  The County's policies, practices, and/or customs were moving forces behind, and caused, were proximate causes of, and were producing causes of, constitutional violations and resulting damages and death referenced in this pleading.

3.     Defendant Erik L. Gay (sometimes referred to herein as "Mr. Gay" or "Jailer Gay" is a natural person who resides, is domiciled, and may be served with process at 8604 Green Ridge Court, Alvarado, Texas 76009 (in Johnson County).  Mr. Gay may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Gay at his dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Gay is being sued in his individual capacity, and he acted at all relevant times under color of state law.  His actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Mr. Gay was employed by the County at all such times and acted or failed to act in the course and scope of her duties for the County.

4.     Defendant Darien A. Kirk (sometimes referred to herein as "Mr. Kirk" or "Jailer Kirk") is a natural person who resides, is domiciled, and may be served with process at 1649

Woodhall Way, Fort Worth, Texas 76134.  Mr. Kirk may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Kirk at his dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Kirk is being sued in his individual capacity, and he acted at all relevant times under color of state law.  His actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Mr. Kirk was employed by the County at all such times and acted or failed to act in the course and scope of his duties for the County.  All natural person Defendants in this case (Mr. Gay and Mr. Kirk) are collectively referred to in this complaint as the "Individual Defendants."

### B.      Jurisdiction and Venue

5.      The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statute(s) providing for the protection of civil rights.  This suit arises under the United States Constitution and 42 U.S.C. § 1983.  The court has personal jurisdiction over the County because it is a Texas county.  The court has personal jurisdiction over the Individual Defendants because they reside and are domiciled in, and are citizens of, Texas.  Venue is proper in the Dallas Division of the United States District Court for the Northern District of Texas, pursuant to 28 U.S.C. § 1391(b)(1).  All Defendants are residents of Texas, and Mr. Gay is a resident of the Northern District of Texas, Dallas Division, by being a resident of Johnson County, Texas.

## II.      Factual Allegations

### A.      Introduction

6.      Plaintiff provides in factual allegations sections below the general substance of certain factual allegations.  Plaintiff does not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, Plaintiff intends that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiff's allegations, and further demonstrate that Plaintiff's claim(s) have facial plausibility.  Whenever Plaintiff pleads factual allegations "upon information and belief," Plaintiff is pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.  Moreover, where Plaintiff quotes a document, conversation, or recording verbatim, Plaintiff has done Plaintiff's best to do so accurately and without any typographical errors.  Plaintiff pleads facts which give rise to "conditions of confinement" and/or "episodic acts or omissions" claims.

### B.      Javonte Myers

7.      Javonte Myers was only 28 years old at the time of his death.  His death was foreseeable and easily preventable.

### C.      Javonte's Death Resulting from Incarceration in the Tarrant County Jail

8.      Javonte suffered a tragic, completely unnecessary death in or about June 2020 after being incarcerated in the County jail.  Individual Defendants' deliberate indifference and objective unreasonableness in their actions and inaction caused, were proximate causes of, and were producing causes of Javonte's suffering and death, and all other damages referenced in this complaint.  This section of the complaint provides only some material facts related to Javonte's

death and suffering.   Plaintiff sets forth other material facts related to Javonte's death and suffering in other portions of this complaint.

9.      The County knew, when Javonte entered its jail on or about June 17, 2020, that he had serious health issues. The Screening Form for Suicide and Medical/Mental/Developmental impairments indicated that Javonte had a seizure disorder, had insomnia, was schizophrenic, and had an anxiety disorder. The form also indicated that Javonte had a serious injury/hospitalization during the prior 90 days, due to seizures. The form also indicated, in response to the question, "Have you ever had a traumatic brain injury, concussion, or loss of consciousness?," that Javonte had seizures and loss of consciousness. The form also indicated that Javonte heard noises or voices that other people do not seem to hear.  The form also indicated that Javonte was depressed and had medical problems, had flashbacks from a rough childhood, had received emotional or mental health services through MHMR, had been in the hospital for emotional/mental health two months before, and during that hospitalization, was diagnosed as being bipolar, having depression, and schizophrenic. These answers were such that, pursuant to law, the Tarrant County Jail had to notify a magistrate, mental health, and medical regarding Javonte's issues. Ultimately, as referenced elsewhere in this pleading, it was an untreated seizure that would medically cause Javonte's death. He would lay on the cell floor, for hours, before being found.

1.      Witness Statements

10.      Plaintiff lists in this section of the complaint relevant summaries of some material portions of witness statements provided by some individuals.  Plaintiff intends that information in this section of the pleading, along with all other information in this pleading, support plausibility of Plaintiff's claims.

a.      Esparza, Robert - Jailer

11.     Texas Ranger Trace McDonald, who had an office in Hearst and an office on the 7th floor of the Tarrant County Jail, took a statement of County Jailer Robert Esparza. Jailer Esparza indicated that he worked the second shift at the jail, which was from 3:00 p.m. to 11:00 p.m. He was working that shift on June 19, 2020, when jailers found Savion, deceased.

12.     Jailer Esparza said that he did not have any interaction with Javonte. Jailer McDonald said that Javonte was incarcerated on the "C side." He also said that, when jailers arrived at the jail to begin their shift, they would usually make a decision as to who would work "C" side and who would work "D" side. Each side had a block of cells.  They would either split the sides or take turns walking the sides. Ranger McDonald said, "That's a lot. I went and walked it last Friday and 39 cells is a bunch." Jailer Esparza agreed.  On the day that Javonte died, Jailer Esparza said that he and Jailer Schubert decided that Jailer Esparza would take the "D" side, and Jailer Schubert would take the "C" side.

13.     Ranger McDonald asked about the activity log that jailers were required to complete at the Tarrant County Jail. Jailer Esparza said that jailers had to input their "walks," which were 20-minute checks in that portion of the jail. Jailers were required to input anything unusual that happened during the shift. Ranger McDonald confirmed with Jailer Esparza that the typical practice was for only one of two jailers to be logged into the system, and both jailers would write in the activity log for the signed-in jailer. Ranger McDonald asked, "So even though it may say that it's Esparza, it could actually be Schubert doing the checks or whatever." Jailer Esparza responded, "Correct."

14.     Jailer Esparza said that when he arrived at the jail at 3:00 p.m. on June 19, 2020, it was the first time he had ever worked with Officer Schubert. Therefore, he did know whether

Officer Schubert preferred to do paperwork or the initial cell checks. Officer Schubert did the initial cell check, so Jailer Esparza did the paperwork regarding being sure that a radio was there, all needed equipment was there, and all paperwork was correct from the prior shift. Jailer Esparza, confirming custom and practice at the jail, told Ranger McDonald that Jailer Esparza had been employed at the jail for three years. He also confirmed that he had worked that floor and area probably once each week. Jailer McDonald said that jail management rotated jailers around the jail instead of keeping jailers in just one area.

15.     Ranger McDonald asked Jailer Esparza how cell checks are supposed to occur. Jailer Esparza said that the jailer that does the initial check will walk both sides of the area. A jailer will sometimes walk all the way down one side, and then come back and walk the other side or a jailer could walk the whole C side, for example, go through the gym, come around, and then check the whole D side. Ranger McDonald confirmed that jailers were supposed to check inmates in that portion of the jail once every 20 minutes.

16.     Ranger McDonald asked Jailer Esparza what jailers were supposed to do when they were conducting a check of an individual cell. Jailer Esparza responded, "Well, you're looking and make sure they are alive, they are there. First that they are there, they're alive, and there's nothing contraband, that they don't have contraband in there." When Ranger McDonald asked how a jailer would know whether an incarcerated person were alive, Jailer Esparza said that the inmates are typically asleep when jailers would arrive for the 3:00 p.m. to 11:00 p.m. shift. Jailer Esparza said that jailers would "look in there and just kind of look at them and make sure they're breathing." This is inconsistent with all known jail practice, which requires confirming the "rise and fall" of the inmate's chest. When Ranger McDonald asked Jailer Esparza whether it was fair to say that Jailer Schubert didn't do that (looking in the cell and making sure that Javonte was breathing) on

the day Javonte died, Jailer Esparza responded, "I'm afraid that looks like he didn't, no." Ranger McDonald responded, "Because he'd been dead a while." Ranger McDonald also said that he thought, "It was a little after 4 o'clock." He didn't ask what time jailers fed prisoners at night, and Jailer Esparza said that they started feeding at 4:20 p.m. Jailer Esparza also confirmed that Javonte would have been one of the first inmates to be fed, because he was in Cell Number 2.

17.    Ranger McDonald said, "So this really isn't a question because I know this happened. I know that first shift and second shift both put on the forms that checks were done that weren't done, or at least weren't done properly. So it's not a matter of did it happen, I know it happened. I'm more curious as to why it happened. Have you been trained in a way that says that's okay? I'm just curious." Jailer Esparza, recognizing that he would certainly not want to implicate himself regarding making false entries into governmental records, told Ranger McDonald that he did not recall ever missing a cell check and denied ever writing into a cell check log that he conducted a check that he in fact did not conduct. Regardless, that manner in which these cell checks were conducted was consistent with custom and practice in the jail.

18.    Ranger McDonald said, "And the Tarrant County Sheriff's Office is a government agency, and if you make a false log on there saying you did a check and you didn't, that's a felony every time you do it. It's wrong, number one. And number two, it's illegal. And number three, those guys depend on you all for water, food, medical, all of that. They're like dogs in a cage and if you don't feed them, they don't get fed, right?" Jailer Esparza responded, "Correct." Ranger McDonald then said, "And if you don't give them the medical attention they need, they don't get it." Ranger McDonald also said, "Refresh my own memory here. All right. So you were the one doing the log-in that day. So you started at 4:20 [p.m.] and then MedStar, Fort Worth Fire on floor

at 4:49 [p.m.]. . . . And then, obviously, everything kind of goes crazy once you all find him deceased in his cell."

19.     Ranger McDonald concluded the interview by saying in part, "Just because I think the sheriff's office is going to be looking at it a whole lot harder from here on out because we had three people die in a week, right?"  Ranger McDonald touched the tip of the iceberg.  The Tarrant County jail, as the Sheriff and County Commissioners knew, had been a dangerous place for prisoners for quite some time. Unfortunately, inmates suffered and died as a result of the policies, practices, and/or customs of the County jail.

### b.    Gay, Erik - Jailer

20.     Ranger McDonald also interviewed Jailer Gay related to Javonte's death.  Jailer Gay had an attorney present for the interview.  Jailer Gay confirmed that he and Jailer Kirk were covering 75C and D at the time of Javonte's death. Jailer Gay said, regarding the manner in which he and his fellow jailers would customarily conduct cell checks, sometimes one jailer would conduct one cell check walk, and then other times jailers would separate. He said at times when jailers would separate, one would do one side of the cells, and the other would do the other side of the cells. He said that there was no specific side ever assigned to a specific jailer.

21.     Confirming the custom and practice referenced in this pleading of the County as it relates to claims in this case and inmates in the jail, Jailer Gay said that the two shifts, one when Javonte died, and one when Javonte was found deceased, went pretty much as normal. Ranger McDonald asked, "Was there anything different about that day, or was it just about . . . how it always goes?" Jailer Gay responded, "For the most part, that's pretty much how it goes."

22.     Ranger McDonald, when reviewing documentation related to Javonte's death, continued his further questioning of Jailer Gay. He saw that at 10:10 AM, there was a note that

Javonte had received his lunch tray and was seen alive at that time. Further, at approximately 10:44 AM, Javonte returned the lunch tray. Ranger McDonald then said, "At 10:44, that's the last time we know he's alive." Jailer Gay flatly responded, "Correct." Thus, the last observation of Javonte, when he was known to be alive, was well over 5 hours before he was found deceased.  Jailer Gay confirmed that had Javonte not passed away, he would not remember Javonte's name at all. Jailer Gay confirmed that there were 39 cells on one side, and 39 cells on the other side.  Thus, a total of 78 cells had to be checked every 20 minutes.

23.      Ranger McDonald asked Jailer Gay to tell Ranger McDonald, in his own words, what a jailer would have to do to correctly conduct a cell check. Jailer Gay lied to Ranger McDonald, "If a check is written as completed, it would mean that a check was done." Jailer Gay knew that recorded checks of cells including Javonte's cell, before and after he died, were not conducted.

24.      Ranger McDonald attempted to clarify his question, regarding what a check was specifically. Jailer Gay responded, "It would be visually or observing the inmate." Ranger McDonald asked Jailer Gay whether Ranger McDonald's understanding was correct that a jailer is supposed to look into each individual cell. Jailer Gay confirmed Ranger McDonald's understanding. Ranger McDonald also asked whether a jailer was supposed to see movement, "chest rising and falling if they're sleeping..." Jailer Gay confirmed what was, upon information and belief, the accepted custom and practice in the Tarrant County jail. He said, "Yes. It has been brought to many people's attention that the inmates cover their lights, preventing you from seeing their chest rising. It's also their face. You can't see their face, because a lot of them have their faces covered. So I mean, a lot of times there is no... You know, you observe a body."  However, looking

for the "rise and fall" of an inmate's chest, which is standard practice in the corrections community, was not the custom and practice at the County jail.

25.     Ranger McDonald asked whether the only way to really conduct a check in such a situation would be to open the door or the kick the door. Jailer Gay responded, "You kick the door. Beat it. Maybe every 20 minutes, to check and see if... 'Hey, get up,' every 20 minutes." Ranger McDonald said that he had walked the cells on Friday, and it was his opinion that to physically look in every door, every window, you would not be able to sit down your entire shift. Jailer Gay confirmed Ranger McDonald's understanding. Jailer Gay's lawyer asked about the name used in the Tarrant County jail for the record of cell checks. Jailer Gay said it was referred to as an "activity log."

26.     Ranger McDonald pointed out to Jailer Gay that Jailer Gay made false entries as to cell checks which Jailer Gay alleged had been done. Jailer Gay's attorney asked Ranger McDonald, "And what you're saying is that the video of the jail shows that at the time these walks were documented, they were sitting in the pod?" Ranger McDonald affirmed the truthfulness of question. The attorney was referencing the fact that Jailer Gay and Jailer Kirk were simply sitting in a work area at times they indicated, in electronic governmental records, that they were in fact checking on prisoners including Javonte. While they sat and talked, Javonte suffered and died.

27.     Jailer Gay volunteered, "Okay. Honestly, I couldn't tell how many, what, particularly why they were not done. I try to remember the day. I know that there were some instances where I saw him come back in from the side and put completed on there. I don't know with any of those, what they would be." Jailer Gay was attempting to fabricate a defense for an indefensible position. He simply sat with his coworker and "shot the bull" while Javonte suffered and died.

28.     Ranger McDonald further lamented, "It's what happens in jails. And I don't pretend to know how to fix it, to make it where you can do that. That's beyond the scope of my ability. . . . Somehow it's got to stop. We've got to get people over there to really do them, because there is a remote chance that it might have saved this guy, had we kicked on the door and said, 'Uh-oh. He's really not moving. Let's you know? Again I'm not trying to place any blame on you at all, bro. That's not what I mean. But I'm just saying the whole system, they need to take that a little more seriously."  Ranger McDonald, having an office at the Tarrant County jail, was expressing his frustration with the custom and practice at the jail.

29.     Jailer Gay admitted that cell checks were not conducted:  "I mean, they were not done. Yes."  Jailer Gay and Jailer Kirk just sat in the picket instead.  It then came to light that what occurred regarding Javonte's death was not an isolated occurrence.  Or one unknown jail higher-ups. It was in fact a custom and practice.

30.     Jailer Gay's lawyer told Jailer Gay to tell Ranger McDonald what Jailer Gay previously told the lawyer. Jailer Gay's lawyer said, "About the global reason why it happens the way it does." Jailer Gay responded to his lawyer, "As far as everybody?" Ranger McDonald said, "Well, that's about what I was going to ask you." Ranger McDonald started, "Did a supervisor or . . ." Jailer Gay then interrupted and responded, "That definitely goes farther up than just officers. The supervisors know about it. Yeah." Jailer Gay's lawyer then told Jailer Gay to tell Ranger McDonald what Jailer Gay had told his lawyer, since Jailer Gay was going to get in trouble for Javonte's death.  Jailer Gay's lawyer told Jailer Gay to tell Ranger McDonald "the whole story."

31.     Jailer Gay said, "So even during feeding, after those death in custodies from the baby being born, died, and the suicide, the only thing that they've concerned about is they're only concerned about making the computer look good. They tell you if you're feeding [inmates], you

stop what you're doing, go put another block in [to the electronic observation log], and then go back to feeding. So, I mean you're openly wanting to get it done." Jailer Gay's lawyer asked him, "Openly wanting what done?" Jailer Gay flatly responded, "Falsifying a government document."

32.     When Jailer Gay's lawyer asked him, "And when you say 'they,' who are you talking about?" Jailer Gay responded, "Sergeants and supervisors. Lieutenants. And it goes all the way up to memos. I mean, there's memos that they put out about it as well." Jailer Gay's lawyer then prompted Jailer Gay, asking whether the Ranger should get an email that was sent on or about May 29, 2020 from Jailer Gay to someone. Jailer Gay said, "That was to the officer that does the non-supervisory meetings. What is it? Maronski? Peter Maronski. He does the non-supervisory meetings, and they go in to ask a series of questions and all that jazz. I brought all these points up to him in that email, to ask to the sheriff as to why we're doing this."  Thus, upon information and belief, the Sheriff was fully aware of issues addressed in this pleading.

33.     The interview continued. Jailer Gay's attorney asked Ranger McDonald, according to a document Ranger McDonald was reviewing, how many times Jailer Gay and or Jailer Kirk indicated that cell checks were conducted during that shift that were in fact not conducted. Ranger McDonald responded, "About nine."  This was an understatement.  He also said that Jailer Kirk did most of them, and Jailer Gay did some.  Ranger McDonald gave jailers the benefit of the doubt, by counting a cell check if jailers merely walked down the hall, even though they never looked into individual cells. Clearly, these were not cell checks by any standard, including all known jail standards in the United States and standards promulgated by the Texas Commission on Jail Standards.

### c.      Kirk, Darien – Jailer

34.     Ranger McDonald also took Jailer Kirk's statement. Jailer Kirk indicated that he was working with Jailer Gay, first shift, when Javonte died. First shift was from 7:00 a.m. to 3:00 p.m.  Jailer Kirk had worked for the Tarrant County Jail, as a corrections officer, for approximately six years. He was therefore very familiar with the custom and practice of the jail as to all issues relevant to claims in this case.

35.     Jailer Kirk heard about Javonte's death after he had already ended his shift and left the jail. He said the name "Javonte Myers" sounded familiar, but he did not know who it was. Jailer Kirk volunteered, "And I ain't know nothing about the guy, because I ain't even know if he had any medical problems or anything, so."  Jailer Kirk confirmed that he was working the "D" side on the day that Javonte died, and that Jailer Gay was covering the "C" side. Ranger McDonald confirmed that there were 39 cells on each side (for a total of 78 cells). Jailer Kirk said that, at the beginning of his shift, each jailer would choose a side because it would be easier for each jailer to only concentrate on one side.  However, as alleged elsewhere in this pleading, the County left jailers to split work however they pleased.

36.     Ranger McDonald confirmed that Jailer Kirk's name, as listed in certain Tarrant County Jail records, would be shown as "DA Kirk." Ranger McDonald also confirmed with Jailer Kirk that, when a jailer would log into the computer to make entries regarding cell checks, both jailers would make entries under one jailer's name.  Ranger McDonald confirmed that, on the day Javonte died, all 39 cells were full on each side. Jailer Kirk recalled one inmate on "C" side being discharged, but he knew "it was full on both sides."  Ranger McDonald then cut to the chase.

37.     Ranger McDonald said, "Okay. All right. Well, so here's where the problem lies. And this really isn't a question, I'm just going to show you. So all of these entries, okay, it says

observation check start, observation check completed. Every one of these stars ... means that you didn't really do it. And it's on video, not ... so we got video of the actual inmate hallway and we have a video of the picket. And so we can see that you really didn't do it. . . . But the problem is, every time you write down here that you did something that you didn't really do, this is a government document. And so that's a felony every time you do that. I mean, you seem, to me, to be a nice guy. You've been working in there for six years. I'm more curious about ... there's no question that you did it. The question is why?"

38.    Jailer Kirk did not deny that he had falsified observation records related not only to Javonte, who died as a result, but also all other inmates under his care. Jailer Kirk responded, "Really, we were just talking, just talking to [inaudible] the time and . . . ." Ranger McDonald confirmed that Jailer Kirk was saying that he and his partner were just talking instead of actually getting up and conducting checks which were recorded as being done.

39.    Ranger McDonald indicated to Jailer Kirk the simple truth that, if Javonte had not died, no one would have ever known about recording cell checks that actually never occurred. Ranger McDonald asked, "If we were to look at weeks and weeks before, would we find more of [cell checks not conducted but which were recorded as being conducted]?" Originally, Jailer Kirk, said, "No." After Ranger McDonald told him to be honest, Jailer Kirk, upon information and belief far under-describing what actually occurred, said, "Okay, I'm going to be honest. Probably one or two times, like every other day, but majority time and space, you don't see these ... up on five. It had happened sometime [inaudible] the time. So I don't really do the walks."

40.    Ranger McDonald and Jailer Kirk then had a discussion about the difficulty of doing all the work that was required of Jailer Kirk, with so many inmates, and conducting cell checks every 20 minutes. Ranger McDonald said, "You'd be hard-pressed to ever sit down, if you

did it right." This did not excuse Individual Defendants from performing their duties, but it does inform related County policies, customs, and practices references in this complaint.

41.    Returning to falsification of records during the time that Savion died, Ranger McDonald confirmed that it wasn't just Jailer Kirk that falsified observation records, but Jailer Gay as well.  Ranger McDonald asked Jailer Kirk whether he and Jailer Gay discussed the records falsification issue, and whether they were prepared for something like this. Jailer Kirk responded, "Really, we weren't.  I wasn't expecting it because, especially since I'd been there almost three years, I noticed that you get laid back once in a while, so."  "Laid back" had apparently been allowed at the jail.

42.    Ranger McDonald, pointing out what Jailer Kirk and Jailer Gay already knew, as well as the Sheriff of Tarrant County and all management between the Sheriff and the jailers, said, "So at about 10:44, this guy gives his tray back. And somewhere between 10:44 and four something, he dies. And if somebody that said that they were doing those checks, would have done them and realized that he was incapacitated. He might have survived. . . . I think that will probably bring home the importance of really doing those checks. Because like I told the last guy, I mean, whenever those guys are in that single cell like that, I mean it's like having a dog in a cage, he don't eat, he don't drink, he don't pee, he don't do anything without you giving him the ability. Right? ... And you're the only one that can get him medical attention. So my hope for you is if ... if you continue to be employed by the Sheriff's Office after this, is take that part more seriously. Think about it.  If it was you or your brother in there, you would dang sure want somebody checking on him every time, I'm sure."

43.    Ranger McDonald also said at one point, "I would think shift change would be a really important time to be thorough on your checks. But if you all would have been doing those

it would have been . . . so at 10:10, Inmate Myers was on camera receiving his tray, 10:44 Myers was viewed on camera placing his lunch tray back on the food cart. And so sometime after that, we don't know exactly when, but he was already in rigor when he got found. So he'd been dead a while."

### d.      Schuppert, Troy - Jailer

44.      Ranger McDonald also interviewed Jailer Troy Schuppert. Ranger McDonald indicated that the reason for the interview was because Jailer Schuppert was working the evening (second) shift on June 19, 2020, when Javonte was found deceased.

45.      Jailer Schuppert told Ranger McDonald that he would be working at the Tarrant County Jail two years as of August 2020. Jailer Schuppert said that prior to working at the jail, he worked at a Texas Department of Criminal Justice prison located in Amarillo. Jailer Schuppert said that the night Javonte died, he was working second shift with Jailer Esparza. They were working "75 C and D." Jailer Schuppert said that, technically, he and Jailer Esparza were both assigned to 75 CD, but since he had gotten to the jail, jailers split the sides on 75. One jailer would conduct cell checks on one side, and the other jailer on duty during a given shift would conduct cell checks on the other side. Jailer Schuppert said that the reason it was done that way was because they had 39 incarcerated persons with which they had to interact. They had to assure that showers occurred, phone calls were made, questions were answered, and medication was dispensed. He said, "There's a lot of things you got to run inside of that pod in 75." Upon information and belief, as alleged elsewhere in this complaint, this was not always the way work was divided.

46.      Jailer Schuppert volunteered his opinion, regarding Javonte's death, that Officer Esparza was not involved. Jailer Schuppert said that the pod where Javonte was found was Jailer

Schuppert's pod, and not Jailer Esparza's pod. Jailer Schuppert said the whole side on which Javonte was incarcerated was Jailer Schuppert's responsibility.  This was not entirely true.

47.     Ranger McDonald obtained from Jailer Schuppert general information about the layout of the jail. Jailer Schuppert told Ranger McDonald that there were pods 75 C and D, and 75 A and B. Those were on the same floor, but on opposite sides. Jailer Schuppert said that the entire jail, except the second floor, is comprised of single cells. Jailer Schuppert said that the second floor contains single cells used primarily for trustees. Jailer Schuppert said that the infirmary is on the fourth floor, and it had some cells in which more than one person would be incarcerated for medical reasons.

48.     Ranger McDonald volunteered information about what he referred to as a "pretty nasty case." Jailer Schuppert referenced that occurring in November 2018, and he confirmed in response to Ranger McDonald's question that it was "an old man." Jailer Schuppert said, "I was just getting started. I was probably two, three weeks in, and I worked with one of the females that was involved in that." Ranger McDonald asked Jailer Schuppert if he had ever seen the video, and Jailer Schuppert said that he was never able to see it. Ranger McDonald said, "It was bad." Jailer Schuppert said, "It traumatized my sergeant and lieutenant at that time, and... I just took their word for it." Ranger McDonald responded, "Yeah. Bad old deal. For sure." Upon information and belief they were referencing the beating death of an inmate referenced in this complaint.

49.     The interview returned to facts related to Javonte's death. Jailer Schuppert confirmed that he was working the 3:00 p.m. to 11:00 p.m. shift. He said that he conducted his initial jail checks when he came in. When he saw Javonte in the cell, he described his perception as, "Nothing really stood out when I came to inmate Myers. Really, the only thing that I noticed is his head. He was laying back on his mattress; he has mattress on his floor. And he was just laying

back . . ."  Ranger McDonald interrupted Jailer Schuppert and said, "So, he was on the floor now, but he was still far enough back that you could see him when you looked through the . . ." Jailer Schuppert responded, "Just his head, yes sir."

50.    Jailer Schuppert said that he was "just going to put it out there." Jailer Schuppert said that he knew that he was being complacent, and that he was supposed to look for Javonte's breathing - the rising of his chest-"and things of that nature."  He said, "I was complacent in doing that."  He said that instead of complying with his understanding of what he should have done, it was his practice "when [he] look[s] in their cells is I'm looking for something that stands out. Something out of the ordinary. That's [inaudible], so playing with feces, things of that nature. If they've got towel wrapped around their neck, anything like that." Upon information and belief, Jailer Schuppert was describing the custom and practice in the Tarrant County Jail, which was used by virtually all jailers, and known by supervisors.  The custom and practice was not looking for the rise and fall of a person's chest.  Regardless, Jailer Schuppert did not find Javonte, deceased, until Javonte failed to respond to getting his food tray.  It was only then when Jailer Schuppert opened the cell door and found Javonte deceased.

51.    Jailer Schuppert said that the practice for feeding for him was to see the face of the person in the cell. Consistent with this practice, he went to Javonte's cell, banged on the cell door, opened the food port, and set Javonte's food tray. Javonte did not move. Jailer Schuppert said, "Hey." He then kept banging on the door and received no response. He then nudged Javonte's ankle, possibly through the open food port door.  When he received no response, he called out to Jailer Esparza to assist him. Javonte's eyes were closed, and when Jailer Schuppert picked up his arm, he noticed that it did not feel right, it was stiff. This was rigor mortis, proving that Javonte had been deceased for quite some time.

52.     Jailer Schuppert, either attempting to deal with this situation or avoid liability, said, "And that's kind of the thing is, when I sat down and had a moment, I couldn't put his death on me because even if I would have came in there and... found him right when I came in there, the outcome would have been the same. But the hour and twenty-five minutes, I'm responsible for that. That's on me." Ranger McDonald told Jailer Schuppert that he appreciated Jailer Schuppert "owning up to that," and he said that he thought the Sheriff's Office would likewise appreciate it. Jailer Schuppert responded, "I can't try to blame that on anybody else. That was an hour and twenty-five minutes. He sat there way too long. That was my fault, so."

53.     Ranger McDonald asked more about Javonte's body's position when Jailer Schuppert opened the cell door. Jailer Schuppert said that Javonte was just laying, and had his mattress kind of folded up a little bit on the floor. He said that Javonte's feet were facing the door, with his arms crossed around, and his head propped up. He said that Javonte's head was propped up by mattress.

54.     Jailer Schuppert then described medical personnel appearing at the cell. Ranger McDonald, understanding that Javonte had been deceased for quite some time before being found, said, "Yeah, I'm surprised the medical personnel at that stage of death would even bother, really." Jailer Schuppert said that they were trying to "beat on" Javonte and "everything like that," and Javonte was not moving. The AED did not advise a shock, which was further indication that Javonte had been deceased for quite some time.

55.     Ranger McDonald and Jailer Schuppert then discussed the manner in which cell checks were recorded. He confirmed that Jailer Esparza had logged into the system, and then would allow Jailer Schuppert to make entries into the system under Jailer Esparza's name. However, Jailer Esparza would actually put cell check entries into the system for both of them. He would write,

"75 CD observation check starts," or something similar. The two jailers would then both go out and conduct their cell checks on their specific side. Jailer Esparza would then type in something like, "75 CD observation check complete." Jailer Schuppert said typically on a shift one person would count, and the other person would do the full cell check on both sides.  This showed that that the County left division of work duties to jailer discretion.  Ranger McDonald indicated that the way that Jailer Schuppert described making such cell check entries was different from the prior shift, because sometimes one jailer would type into the system and at other times the other jailer would type into the system.

56.    Ranger McDonald asked whether Jailer Schuppert had witnessed falsification of cell check records at the Tarrant County Jail before. Jailer Schuppert responded, "Not as blatant as I've heard it happen. I've seen it to where they'll put it in and they just won't go out there. I've seen that before." He also said, "Or that they'll put it in and they'll just kind of sit and pick it. And then the next 20 minutes they'll go and they're like, 'Alright, let's go do the walk.' I've seen that."  Upon information and belief, he had seen it often.

57.    Investigator Kline conducted an investigation of Javonte's death for the Tarrant County Sheriff's office, and he also interviewed Jailer Schuppert.  Jailer Schuppert indicated that he worked second shift at the jail, from 2:30 P.M. to 11:00 P.M.  Jailer Schuppert showed Detective Kline the online digital log for cell checks, jailer's input activity they are doing at the time into the log, which automatically digitally stamps the date and time. Jailer Schuppert showed Investigator Kline where he had entered each check of housing units C. The checks were approximately 20 minutes apart.  When Jailer Schuppert told Detective Kline that he checked Javonte in cell number two, he entered each check into the log. He said that he looked into each cell, including Javonte's cell, during each check. He said that Javonte was in the same position on each check - laying on

the mattress on the floor of the cell. Javonte's feet were close to the cell door, with his head toward the back of the cell. Javonte's head was leaning slightly to the left, with his hands on his chest, and his feet and legs outstretched. Upon information and belief, jailer Schuppert failed to look for the rise and fall of Javonte's chest.

### 2.     Tarrant County Sheriff Records

58.    Tarrant County Sheriff records indicate that Jailer Esparza and Jailer Schuppert entered 75C with dinner trays at 4:21 P.M. on June 19th, 2020. Records further indicate that, at 4:25 PM, Jailer Esparza fed Cell 12 while Jailer Schuppert fed Cell 1. At 4:25 P.M., Jailer Schuppert opened the food port to Cell 2, and offered a tray, while Jailer Esparza fed Cell 13. At 4:26 P.M., there was no response from Javonte in Cell 2, to Schuppert, while at the same time Jailer Esparza was feeding Cell 14. Jailer Schuppert opened the (likely food port) door, and tapped Javonte's foot, receiving no response. Jailer Schuppert then gave Jailer Esparza the keys, and entered the cell. There was still no response from Javonte.

### 3.     Medical Records / Death Reports

#### a.     EMT Records

59.    MedStar Mobile Healthcare records indicate that Javonte was found at the jail, on June 19, 2020, lying supine in the hallway. His vitals were respiration rate zero, Glasgow Coma Scale 3, no eye movement, no vocal/verbal, no motor response, and with a pulse of zero. Javonte was apneic.  He had obvious signs of rigor mortis to his right arm (with his arm being held at a 90-degree angle), his left arm, both hands, fingers, and jaw.  Javonte also had non-reactive pupils. Javonte had been dead in his cell for hours.

60.     An EMT wrote into the medical record that the EMT was told by Tarrant County Sheriff's Office staff that there were "routine visual checks done on (Javonte) every 15 minutes." This was clearly false and designed to make jailers and the Sheriff's Office appear that they had done nothing wrong. Further, the EMT wrote, "The officer denied any report about [Javonte] from the crew he had relieved and was unable to give last known times seen awake and talking." This was in fact the custom and practice at the jail. There were inappropriate or no pass-down logs or information provided about specific inmates. Further, the EMT wrote, "EMS arrival [Javonte] was as noted and met criteria for withholding resuscitative efforts. Therefore, no resuscitation was administered by EMS and there were no objections by any provider or law enforcement on scene for pronouncing [Javonte] dead on arrival."

### b.     Autopsy Report

61.     The Tarrant County Medical Examiner's Office conducted an autopsy of Javonte. The findings indicated in part that Javonte was found unresponsive in a solitary floor on a cell mattress in the MHMR Unit at the Tarrant County Jail.  Javonte was pronounced deceased at the scene. This is further evidence that Javonte had been deceased for hours before he was found.  The cause of death was seizure disorder. Upon information and belief, had Javonte been properly observed, he could have received immediate medical treatment, and his life would've been saved. Tasha Z. Greenberg, M.D. signed off as the Deputy Medical Examiner conducting the autopsy.

### c.     Custodial Death Report (Filed with Attorney General)

62.     Donnie Denton, with the Tarrant County Sheriff's Department, filed a custodial death report with the Attorney General of Texas regarding Javonte's death. He wrote that Javonte was only 28 years old at the time of his death, that his original incarceration at the jail was at 3:41

a.m. on June 17, 2020, and that he died at approximately 4:50 p.m. on June 19, 2020. Obviously, the time of death was false.  Javonte had died hours earlier.

63.     The custodial death report admitted that the medical cause of Javonte's death was a seizure disorder. Thus, Javonte's life could have been saved. An alleged offense for Javonte being incarcerated was trespass. This, along with public intoxication, is unfortunately a common offense alleged for people in our community who have serious mental health issues. In fact, the report admitted that Javonte exhibited mental health problems. The summary in the report leaves out important information regarding the failure to observe Javonte for hours after his death: "On June 19, 2020, at approximately 16:28 hrs. Inmate Myers, Javonte was discovered in his cell unresponsive. A code was called and medical personnel responded to treat the inmate. An AED was placed on him and chest compressions were initiated. The AED stated to continue chest compressions. No shocks were advised nor administered. Inmate Myers was declared deceased by Medstar EMT at 16:50 hrs."

### d.     Inmate Death Report (Filed with Texas Commission on Jail Standards)

64.     The Tarrant County Sheriff's Office likely also filed a required inmate reporting form with the Texas Commission on Jail Standards ("TCJS").  However, since the TCJS refused to produce records in response to several Public Information Act requests, Plaintiff did not have possession of it at the time this complaint was filed.

### D.     Investigations

### 1.     Texas Rangers

65.     As indicated above, the Texas Rangers investigated the decedent's death.  The purpose of a Texas Rangers investigation regarding a custodial death, such as the decedent's, is to

determine whether there was any criminal responsibility for what occurred.  Texas Rangers do not determine whether there is civil liability for violation of a person's constitutional rights, such as that alleged in this case.  Therefore, the Texas Rangers' determination as to whether to turn the case over to a grand jury and recommended prosecution does not determine whether Defendants are liable for the decedent's death.

66.     Ranger McDonald, mentioned above, originally arrived at the Tarrant County jail at approximately 6:30 P.M. on June 19, 2020 and met with Tarrant County Sheriff's Office Captain Michael Gravitt. Detective Klein was also on-scene speaking with officers who were responsible for that pod of the jail.  Crime scene investigator, Christine Lawler, was also on-scene taking photographs. Ranger McDonald saw Javonte, laying supine on the floor just outside of cell 75-C2, covered with a blanket. "Myers was in rigor mortis with toes, hands, fingers and jaw extremely rigid, along with being cold to the touch."

67.     Ranger McDonald noted that the purported written policy required inmates in the pod in which Javonte was incarcerated to be checked every 20 minutes. Detention officers are to make an entry into a digital log at the start and finish of every performed check. Ranger McDonald noted that Javonte's medical history indicated he suffered from seizures, bipolar disorder, acute encephalopathy, acute respiratory failure with hypoxia, altered mental status, and cardiac arrest.

68.     When Ranger McDonald compared video recordings to electronic entries by jailer Gay and jailer Kirk, he found a number of false entries - those indicating that cell checks were conducted which, in fact, were not conducted. There were, at a minimum, 20 such checks, but when considered with false entries at the beginning and end of each purported check and/or end of each purported check, there were approximately 37 false entries. Upon information and belief, this was consistent with the custom and practice in the Tarrant County jail at the time of Javonte's

death. In the alternative, the sheer number of false entries supports single-incident liability. Further, upon information and belief, this was well known up through the management ranks at the jail and ultimately potentially to the Sheriff.

### 2. Texas Commission on Jail Standards

69. The TCJS conducted an investigation of the decedent's death. The TCJS regularly conducts investigations of custodial deaths in Texas county jails, and it is the state agency charged with enforcing bare minimum jail standards. However, as stated above, Plaintiff was unable to obtain documents related to that investigation.

### E. *Monell* Liability of Tarrant County

#### 1. Introduction

70. Plaintiff sets forth in this section of the pleading additional facts and allegations supporting liability claims against the County pursuant to *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978). It is Plaintiff's intent that all facts asserted in this pleading relating to policies, practices, and/or customs of the County support such *Monell* liability claims, and not just facts and allegations set forth in this section. Such policies, practices, and/or customs alleged in this pleading, individually and/or working together, and whether supporting episodic acts and omission and/or conditions of confinement claims, were moving forces behind and caused the constitutional violations, and damages and death, referenced herein. These policies, practices, and/or customs are pled individually and alternatively. The County knew, when it incarcerated the decedent, that its personnel, policies, practices, and/or customs were such that it could not meet its constitutional obligations to provide medical treatment to, and protect, the decedent. The County made decisions about policy and practice which it implemented through its commissioner's court, its sheriff, its

jail administrator, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of the County as it related to its jail.  The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege at the pleading stage the identity of the County's chief policymaker.

71.     There were several policies, practices, and/or customs of the County which were moving forces behind, caused, were producing causes of, and/or proximately caused the decedent's suffering and death, and other damages referenced in this pleading.  The County made deliberate decisions, acting in a deliberately indifferent and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist.  Further, when the County implemented and/or consciously allowed such policies, practices, and/or customs to exist, it knew with certainty that the result would be serious injury, suffering, physical illness, and/or death.

### 2.     Tarrant County Policies, Practices, and Customs

72.     Plaintiff lists beneath this heading County policies, practices, and/or customs which Plaintiff alleges, at times upon information and belief, caused, proximately caused, were producing causes of, and/or were moving forces behind all damages referenced in this pleading, including the decedent's death.  Thus, the County is liable for all such damages.  These policies, practices, and/or customs worked individually, and/or in the alternative together, to cause the decedent's death and all other damages asserted in this pleading.  Moreover, when Individual Defendants violated any appropriate policies, practices, and/or customs, and/or other appropriate guidance and/or education provided to them as to how they are to perform their duties in the jail, such violation would be some evidence of a constitutional violation.

73.     The Tarrant County Sheriff's Department had, at the time of Javonte's death, a written definition in its standard operating procedures for its jail for a "face-to-face" observation. The Texas Commission on jail standards requires face-to-face observations. The Tarrant County Sheriff's Department written definition merely read in relevant part that a "face-to-face observation" was to "ensure that inmates are not being mentally, physically, or sexually abused." A jailer was to observe an inmate's "physical condition, activities, attitude, behavior, and morale." This definition was specifically for the general population portion of the jail. However, as indicated elsewhere in this complaint, jailers rotated throughout the jail. Thus, jailers were trained to merely observe certain things about an inmate.  They were not required by the written policy to look for the rise and fall of the chest of an inmate who might appear to otherwise be sleeping. This violated all known jail standards.

74.     The County had a policy, practice, and/or custom of allowing jailers to decide on a shift-by-shift basis, when two jailers worked a cell area with as many as 78 cells, how to split work duties.  Thus, as indicated in this pleading, this could lead to one jailer making 78 observations on any given check.  Thus, not even accounting for walking time, if a jailer took the entire 20 minutes to make a check of all cells, the jailers would have no more than approximately 15 seconds to observe each cell.  This is far too short to conduct any meaningful check.

75.     The County had a policy, practice, and/or custom of allowing jailers to input into records only "unusual" occurrences occuring on a shift.  Thus, jailers could simply make no notes of what actually occurred, thus supporting giving short shrift to cell checks.  This results in jailers becoming numb to things such as watching the rise and fall of an inmate's chest, if the inmate otherwise appears to be sleeping.

76.     The County had a policy, practice, and/or custom of creating false observation records.  When two jailers worked an area, the County allowed one jailer to log in under his name, whil allowing the other jailer to make entries.  Likewise, the County would allow a jailer who logged in to records actions supposed taken by the other jailer.  This violated all known standards, both inside and outside jails and leads to entries of cell checks not actually conducted.

77.     The County had a policy, practice, and/or custom of allowing lax pass-down procedures.  Jailer Esparza noted the the paperwork from the shift preceding his was "okay," even though Javonte was lying in a cell deceased.  Policy, practice, or custom was apparently such that, for example, oncoming shift jailers would not confirm with jailers on the prior shift that apparently sleeping prisoners were alive due to chest "rise and fall" observations.

78.     The County had a policy, practice, and/or custom of rotating jailers in and out of special medical and mental health observation pods.  This resulted in jailers not getting to know specific inmates, and their specific needs.  This worked together with the appearent policy, practice, and/or custom of not information jailers of the medical and/or mental health needs or diagnoses of specific inmates.  As show above, one jailer had no clue about Javonte's preexisting medical issues.

79.     The County had a practice and/or custom of directing jailers to be sure that proper periodic indications of prisoners observations were recorded in electronic records, even if those observations were not actually made.  Jail management wanted to be sure that the jail looked good to the TCJS and other outside agencies, athe expense of the health and lives of inmates.

80.     Upon information and belief, the County's policy was not to regularly take samples of electronic records of cell checks and compare them to video recordings of the areas supposedly checked.  This perpetuated the custom and practice of not conducting cell checks.

3.     TCJS Records Demonstrating County Practices and/or Customs

81.     TCJS reports and documents regarding inspections of the County jails further demonstrate these and other policies, practices, and/or customs which, when applied individually and/or working together, caused, were proximate causes of, and/or were producing causes of damages and death asserted in this pleading.  On May 19 through 21, 2014, the Texas Commission on Jail Standards (TCJS) inspected the Tarrant County jails. The TCJS inspector reviewed a random selection of 50 files, interviewed staff and inmates, training records, and policies related to health services in the jail. While reviewing inmate folders, the TCJS inspector determined that medical paperwork in inmates' files should have been in their medical files.  TCJS inspectors indicated that they would follow up in 30 to 90 days to ensure that all medical records, such as special medical housing assignments, inmate requests for medical services, and mental health services requests were maintained in inmates' medical folders and not in inmate custody files. This was a very important issue, as jailers and others in the jail could not have appropriate knowledge regarding inmates needing special services, such as the decedent.

82.     On March 23, 2015, TCJS inspected the jails again. As a result of the inspection, the Tarrant County jail was listed as being non-compliant with TCJS minimum standards. The TCJS inspector determined that deficiencies existed.  Upon information and belief, the inspection, based on a special inspection report related to it, resulted from the death of an inmate. Documentation received and reviewed by the TCJS revealed that Tarrant County jailers were not completing visual face-to-face observation of all inmates at least once every 60 minutes as required by minimum jail standards. It appears that Tarrant County's failure to do so led to the death of an inmate. This was notice, well before the decedent's death, that appropriate checks and observation

of inmates were critical. Moreover, the inspection report indicated the apparent custom and practice at the jail.

83.     Between April 13 and 16, 2015, the TCJS inspected the jails once again. The TCJS inspector found, regarding health services, that the jail needed to ensure that classification notified a magistrate when it is suspected that an inmate may be suffering from a mental illness or mental retardation. The TCJS inspector, after reviewing documentation regarding inmates suspected of suffering from mental illness, determined that there was an incident in which MHMR felt that the magistrate should have been notified but there was no corresponding documentation to prove that the notification ever took place. As a result, jail staff had to begin attaching the following documents together: Continuity of Care Query return, mental/medical intake screening form, MHMR services request, and notification to a magistrate.

84.     Between May 23-26, 2016, the TCJS inspected the jails once again. The TCJS inspector found, when reviewing inmate files, that some admission files were being contained with inmate medical paperwork. The inspector noted that such items should have been kept separate, in the medical section of the file. The inspector also noted that the majority of operational plans for the jail were last approved in year 2000 - almost 16 years before. The inspection team provided notes and suggestions for updates to operational plans and indicated that they would follow up with jail administration over the next 30 to 90 days to review progress on completion and submission of all operational plans.

85.     Between April 17-19, 2017, the TCJS inspected the jails again. After reviewing a random sample of 50 inmate files, interviewing staff, and reviewing policy related to admission to the jail, and specifically when reviewing holding and detox cell face-to-face observation documentation, the inspection team observed that jail staff exceeded the 30-minute between check

requirement, for typical inmates and not those who are exhibiting bizarre behavior and/or need medical assistance, by as few as two minutes and by as many as eight minutes. As a result, the inspection team requested random audits to be submitted for a review during the following 90 days. However, as Plaintiff has alleged and shown elsewhere in this complaint, the fact that observations were recorded in Tarrant County records was insufficient to prove that such observations actually occurred. In fact, it was a custom and practice to record observations and cell checks even though such observations and cell checks had not necessarily occurred.

86.    Between March 25 and 27, 2019, the TCJS inspected the jails again. While reviewing the County's mental disability/suicide prevention plan, the inspectors determined that the duration and frequency of suicide prevention training for jail employees was not included. Thus, there was no requirement for how much training - and how often - jail staff would receive related to preventing and recognizing suicide. The inspectors noted that jail administration was "currently working on a plan of action for more overall training for jail staff to include suicide recognition/detention." The inspectors required that jail administration email to the inspectors a copy of the plan of action, including duration and frequency of suicide recognition/detection training once such was approved by the TCJS.

87.    Between February 24 and 26, 2020, the TCJS inspected the jail again. While reviewing health services documentation, the TCJS inspection team discovered that, on six occasions, the suicide screening form was not being completed in its entirety. The inspection team noted the importance of ensuring that each box on the form be checked or answered, as dictated by the form. Inspectors required follow-up action, in that TCJS Inspector Jouett would identify screening forms that he wanted to review. Jail administration would then scan and email the forms

to Inspector Jouett. This procedure would occur over the next 30 to 90 days. If any deficiencies were noted, the TCJS would issue a notice of non-compliance to the jail.

88.     On May 21, 2020, a special inspection of the jails occurred by the TCJS.  Upon information and belief, the inspection occurred as a result of the death of inmate Dean Stewart. As a result of the inspection, and Mr. Stewart's death, the Tarrant County Jail was found to be non-compliant with minimum jail standards. The TCJS inspector, after reviewing video evidence and documentation, determined that face-to-face observations and discovery of Mr. Stewart exceeded the 30-minute mandate by 12 minutes. Thus, less than 30 days before the death of the decedent, Tarrant County Jail administration, including the jail administrator and the Tarrant County sheriff of were put on notice - once again - of the importance in ensuring that observations and cell checks were actually made. They knew, based upon this information and prior inspections, that simply recording information in the system regarding cell checks did not mean they actually had occurred. Regardless of this information, the customs and practices referencing this pleading continued in the jail. Unfortunately, Javonte had to suffer and die as a result.

89.     Only six days later, on May 27, 2020, the TCJS inspected just a portion of the jails. The TCJS inspector noted, after reviewing four days of electronic round logs and housing areas where 30-minute observation/rounds are mandated, that there were no issues or violations. This allowed the Tarrant County jail, only six days after the prior inspection, to be compliant again. However, as shown elsewhere in this pleading, the fact that such electronic round logs indicated that cell checks were done did not in fact actually mean they had occurred. According to one Defendant in this case, as referenced in this pleading, jail staff all the way up from jailers through at least lieutenants, and upon information and belief possibly the Sheriff, stressed only making

sure that cell checks were recorded and not that the checks themselves actually occurred. This was the custom and practice in the jail.

90.     Upon information and belief, after Javonte's death, the TCJS conducted a special inspection. However, even after many months of attempting to obtain those records, Plaintiff has been unable to do so. The TCJS has objected under the Public Information Act to Plaintiff obtaining those records. Upon information and belief, once those records are obtained, they will show that the Tarrant County Jail once again violated minimum jail standards.

91.     Between March 8 and 12, 2021, the TCJS conducted another inspection of the jails. The results indicate customs and practices at the jail preceding Javonte's death. When inspectors reviewed health services documentation, the inspection team discovered that on four occasions a magistrate was not notified within 12 hours as required by the Texas Code of Criminal Procedure when an inmate likely had mental health issues. As a result, jail staff had to scan and email the lead inspector 20 forms every Friday for the following 30 to 90 days. If there were any deficiencies, the TCJS would issue an additional notice of non-compliance.

92.     In fact, this inspection resulted in the Tarrant County Jail being listed at the TCJS website as being non-compliant. Equally troubling, when reviewing a random selection of officer TCOLE certification records, officer documentation, and interviewing staff, the inspectors determined while specifically reviewing 30-minute and 60-minute face-to-face observations that the Guard 1 electronic cell check system automatically indicated "out of compliance" on documentation when a jailer would go over the 20-minute or 40-minute internal facility policy required timeframe. Oddly, TCJS inspectors advised the jail on potential legal liability as a result since the TCJS had 30-minute and 60-requirements, and the jail allegedly had corresponding 20-minute and 40-minute requirements, TCJS advised the jail to remove the "out of compliance"

wording to "reduce possible liability." The inspection report indicates that jail "staff agreed." In fact, oddly, TCJS inspectors required jail staff to notify the inspector when the "out of compliance" verbiage had been removed from the Guard 1 system. There was absolutely no state interest in such a requirement, other than protecting Tarrant County from civil liability.

### 4.   Tarrant County Jail Suffering and Death Show a Custom and Pattern of Indifference

93.   Other suffering and death in the Tarrant Countty jail support *Monell* liability.  On October 18, 2010, Betty Rodgers turned herself into the Tarrant County Corrections Center, where she informed jail staff that she had Cirrhosis of the liver and ulcers that would bleed profusely if she is not given her medication. Upon information and belief, jail staff ignored Betty's consistent requests for medication and refused to let her see a doctor. Because Betty did not receive her medication for days, she began vomiting blood, became lightheaded from blood loss, blacked out, hit her head on a metal table, woke up to blood everywhere in her cell, and then pressed the help button. The guard responding to the call simply looked into her cell and then left. Betty later received emergency treatment for her ulcers and head wound.

94.   On January 11, 2011, James Hemphill, who used a wheel chair and had a known history of seizures and DTS, was on suicide watch at the Tarrant County jail and therefore under 10-minute interval cell checks. Jail staff noted that James was on the floor from 8:03 P.M. to 10:54 P.M., but did not enter the cell to check on him. At 11:41 P.M., another jailer noted that James was unresponsive on the floor, started CPR, and called for medical assistance. James could not be revived and was later pronounced dead.

95.   On May 24, 2011, Kaleb Fitzgerald was found in a Tarrant County jail cell with his uniform tied around his neck. He was taken to the hospital and put on life support but eventually

was pronounced dead on June 1, 2011. The custodial death report does not include whether he was on suicide watch, whether he made suicidal statements, whether jailers checked on him in accordance with jail standards, and whether there were any other details related to his death.

96.      On or about July 16, 2011, Mike Martinez, a Tarrant County jail inmate with a history of diabetes and liver cirrhosis, had complained about stomach pain, did not get out of his bunk all day, and did not eat his meals or take his medication. That night, he was discovered unresponsive in his cell and later pronounced dead.

97.      On March 19, 2012, Johnathan Holden was found in a Tarrant County jail cell with a blanket wrapped around his neck. He was pronounced dead the next day. On or about March 5, 2012, Jonathan Holden was booked into the Tarrant County jail on a non-violent burglary charge. Upon information and belief, Jonathan's medical intake noted that he took prescription medication for schizophrenia, had attempted suicide 3 weeks prior, required a competency evaluation, and required a suicide prevention cell. On or about March 16, 2012, jail doctors recommended that Jonathan be transferred to an area at the Correction Center for low to medium-risk inmates. Instead of following this recommendation, jail staff transferred Jonathan to the Belknap Unity, a maximum-security unit that houses dangerous high-risk inmates. Jonathan was housed in a cell near another inmate, Steven Nelson, who jail staff knew was strong, violent, schizophrenic, not medicated, incarcerated for murdering a preacher, frequently in and out of solitary confinement, and had a history of assaulting other inmates at the jail (including "gassing" other inmates by spraying them with a mixture of his feces and urine). despite this information, jail staff allowed Nelson to be outside his cell without supervision while armed with a broom and blankets. On March 19, 2012, Nelson used the broom to provoke Jonathan and then fashioned a noose with blankets, placed the noose around Jonathan's neck, and lifted him off the ground. Jail staff later

found Jonathan hanging from the cell bars with the blanket around his neck. He was pronounced dead the next day.

98.     On June 24, 2012, Irvin Dorsey, who had a known history of strokes, was found in his cell at the Tarrant County jail in need of medical attention. The next day he was pronounced dead. The custodial death report lists the cause of death as a hemorrhagic stroke.

99.     On April 16, 2013, Bernard Eaglin was booked into the Tarrant County jail. Bernard was transferred to the medical floor on May 1, 2013 and then transferred to the hospital on May 15, 2013. Bernard died at the hospital from sepsis.

100.    On May 22, 2013, Eduardo Salazar was transported to the Tarrant County jail and housed on the medical floor. On May 26, 2013, Eduardo was transported to a hospital following a reported fall. The same day, he was transported back to the jail and returned to the medical floor. On June 4, 2013, Eduardo was again transported to the hospital following another reported fall and a seizure. He was later pronounced dead. The custodial death report lists the cause of death as blunt force trauma of head due to ground level fall.

101.    On or about December 12, 2013, Robert Simmons, who was housed in a single cell at the Tarrant County jail, was found unresponsive and later pronounced dead. The custodial death report lists the cause of death as heart disease, but does not give any further detail about what happened.

102.    On September 12, 2014, a nurse at the Tarrant County was passing out medication when she found that William Diener III was unresponsive, not breathing, and had no pulse. The custodial death report lists the cause of death as heart disease, but fails to include any information regarding whether William exhibited any signs that he needed emergency medical help earlier.

103.    On November 4, 2014, Nathan Crawford was found in his Tarrant County jail cell with his blanket wrapped around his neck. Nathan was taken to the hospital where he died a few days later. The custodial death report does not give any information about whether Nathan made any suicidal statements, whether he suffered from any mental illness, or whether cell checks were performed in accordance with minimum jail standards.

104.    On March 11, 2015, Larry Crowley was booked into the Tarrant County jail and was cleared by MHMR to be housed in a single cell with MHMR to follow up at a later time. While passing food trays, jailers found Larry lying face down on the cell floor with a towel protruding from his mother. Soon after, medical personnel pronounced him dead. The custodial death report lists the cause of death as suicide, but fails to include whether Larry exhibited any mental health problems, whether he made any suicidal statements, whether he was on suicide watch, how long he was lying there before he was found, or whether there were any other issues related to his death.

105.    On April 9, 2015, Tarrant County jail staff found Joseph Wilson laying on the floor of his cell in a pool of blood coming from an apparent self-inflicted cut to his arm with a razor blade. Joseph was later pronounced dead.

106.    On or about June 7, 2015, John Polk II was found in his cell at the Tarrant County jail mumbling and unable to stand. He was later pronounced dead, and the cause of death was a brain hemorrhage. The custodial death report does not include any details on what caused the brain hemorrhage.

107.    On September 23, 2015, Tarrant County jailers arrived at the door of Krisha Blackwell's cell and called for her to get her breakfast tray. When Krisha did not respond, one jailer tapped her foot on the cell door and the other jailer tapped metal keys on the door. When

Krisha still did not respond, the jailers noted she refused breakfast and moved on without going in to check on her. More than an hour later, medical staff distributing medications similarly could not get a response but continued distributing medications to other cells without checking on Krisha. After they finished, the jailers went into Krisha's cell and realized she was not breathing. Krisha was later pronounced dead, and the cause of death was associated with her known seizure disorder.

108.    On October 17, 2015, Lupita Hernandez knocked on her cell door and called out for attention, but the Tarrant County jail staff told her to wait. Lupita called out the jailer's name again, and as the jailer approached the cell, Lupita collapsed on the floor. She was later pronounced dead. The cause of death was related to diabetes.

109.    On November 8, 2015, Andrew Canfield, who was housed in a holdover cell at the Tarrant County jail after asking to be moved from his last cell due to an altercation with another inmate, was found hanging by his clothes from the restroom bars in the cell. Andrew was pronounced dead the next day. The custodial death report does not state whether Andrew was on suicide watch or whether he had exhibited or was being treated for any mental health problems.

110.    On or about October 18, 2017, Billy Freeland was booked into the Tarrant County jail, where he informed jail staff that he had a history of alcohol abuse. Billy's family members reportedly informed jail staff that Billy would likely suffer side effects from alcohol withdrawal. On October 20, 2017, jail staff noted that Billy was naked in his cell, uncooperative, agitated, talking to and picking at the walls, and yelling at staff. On October 23, 2017, jail staff noted that Billy was lying on the cell floor, experiencing hallucinations, arm tremors, and labored breathing, and he was disoriented, combative, and resistant. Billy was later taken to hospital, where it was discovered that he was suffering from acute respiratory and renal failure and was essentially

unresponsive. He was placed in intensive care, but never regained consciousness and died on November 4, 2017.

111.    On or about February 9, 2018, Robert Renfrow was transported from the Tarrant County jail to the hospital due to chest pains. Robert was later pronounced dead. The custodial death report lists his cause of death as acute respiratory distress, but fails to explain whether Robert had any related underlying illnesses, whether he was taking any medication, whether he exhibited any signs that he needed emergency medical treatment earlier, or whether there were any other issues related to his death.

112.    On November 7, 2018, Clinton Don Simpson was beaten to death by another inmate, David Flores, in the Tarrant County jail. Though Simpson and Flores were both classified as suicidal, jail staff housed both inmates together.

113.    On January 10, 2019, Jennifer Espinoza was booked into the Tarrant County jail, where medical staff determined that she was detoxing from heroin. On January 16, 2019, Jennifer was found in her cell unresponsive and later pronounced dead.

114.    On April 4, 2019, Derick Wynn was booked into the Tarrant County jail. During the booking, housing, arraignment, and rehousing processes, Derick was combative and resisting jail staff, who used OC spray and various restraints on Derick. During the rehousing process after arraignment on April 5, 2019, Derick experienced a medical emergency in his cell and was later pronounced dead. The cause of death was a drug overdose.

115.    On July 26, 2019, Southany Khiengsombath, who was transferred from the Tarrant County jail to the John Peter Smith Hospital on July 8, 2019, was pronounced dead. The custodial death report gives little information about how this death occurred. It lists the cause of death as cardiac arrest, but also later mentions meningitis, encephalitis, and rhabdomyolysis. It also notes

that Southany was placed on suicide watch because he made statements that he wanted to die, but another portion of the report provides "no" to the questions "make suicidal statements?" and "exhibit any mental health problems?"

116.    On July 31, 2019, Robert Miller, who was being booked into the Tarrant County jail, got into an altercation with the officers and was pepper sprayed. Robert was found in his cell unresponsive about an hour later and was pronounced dead the next day.

117.    On August 31, 2019, Jackson Murphy, who reported medical concerns of diabetes and hypertension at the time of booking into the Tarrant County jail, was pronounced dead. The custodial death report lists the cause of death as heart failure and explains that Jackson was brought to the hospital on July 22, 2019, then brought back to the jail on July 24, 2019, and then brought back to the hospital on August 6, 2019, but fails to note why Jackson was brought to the hospital, whether he was taking his medications, or whether he exhibited signs he needed emergency medical treatment.

118.    On February 26, 2020, Ricky Farmer, who exhibited mental health problems and was housed in a single cell in the Tarrant County jail for his protection, was found lying on the floor of his cell. He was later pronounced dead. The custodial death report filed in June, far beyond the 30-day state law deadline, lists the cause of death as lack of oxygen but does not explain how the death occurred.

119.    On April 6, 2020, Dean Stewart was booked into the Tarrant County jail, classified as suicidal, and placed in a single cell for his protection. On April 26, 2020, Dean was found dead in his cell by suicide. On May 21, 2020, the Texas Commission on Jail Standards found Tarrant County jail out of compliance with minimum observation standards as the Tarrant County jail failed to conduct checks on Dean at least every 30 minutes, leaving him alone for nearly an hour

and checking on him late at least 3 times. Not long before Javonte's death, the Tarrant County Sheriff's office was - once again - put on notice of serious issues with its customs and practices related to inmate observation and care. This "last chance" to remedy these issues unfortunately was passed by with continued deliberate indifference. This opportunity came as a result of the death of Dean Stewart upon information and belief, in the five-hour period before his death, cell checks were conducted late, missing even a 30-minute timeline by 20 minutes or more, missed entirely, or conducted in a manner that was inconsistent with all known jail practices. They, as with Javonte, we're not conducted in face-to-face ways that are consistent with all known jail practices. Instead, one of more jailers merely walked by the cell and did not even look in. One Sergeant with the Tarrant County Sheriff's department, upon information and belief, said that three specific jailers "failed to complete the face-to-face observations, which resulted in the death of an inmate and their actions were both incompetent and deficient."

120.    Further, the Sheriff's department learned from Mr. Dean's death, upon information and belief, that "each floor and officer conducted face-to-face observations differently." Moreover, upon information and belief, three jailers involved in Mr. Dean's death admitted violations of apparent written policy, but argued that their "violations" were not violations of custom and practice due to them being trained to do things the way that they did.

121.    On May 17, 2020, Chasity Congious, a female inmate at the Tarrant County jail who suffers from mental health disorders and developmental disabilities, gave birth in the Tarrant County jail without jail staff's knowledge. According to the federal lawsuit filed on January 13, 2022, jail staff was aware that Chasity was pregnant, had severe mental health problems, was often nonverbal, would be unable to express symptoms of labor, and would not recognize if she were to go into labor. Nevertheless, she was returned from medical to the jail. Jail staff eventually found

Chasity bleeding in her cell and the baby with the umbilical cord around its neck. Though Chasity survived, the baby died within days.

122.    On June 24, 2020, mere days after Javonte's death, Jason Martin, experienced an unknown medical emergency and collapsed at the Tarrant County jail and was later pronounced dead. The custodial death report lists the 40-year-old's cause of death as heart disease, but fails to state whether Jason had been complaining, whether he took medication, or whether there are any other issues related to his death.

123.    On June 26, 2020, Abdullahi Mohamed, who exhibited mental health problems and was housed in a single cell at the Tarrant County jail, was pronounced dead. The facts surrounding his death are unclear. Abdullahi's family claim they were told that he died after some kind of confrontation with the guards in the jail. The custodial death report, however, states that Abdullahi was laying on his mattress on the floor naked, failed to answer jail staff's questions, did not eat his food, and became unresponsive and stopped breathing while in a wheelchair on the way to medical. The report further states that the 41-year-old's cause of death could not be determined.

124.    On September 8, 2020, another inmate alerted Tarrant County jail staff that Dalanna Price was not breathing. When jail staff checked on Dalanna, they found her dead in her cell. The amended custodial death report lists the cause of the 44-year-old's death as heart disease, but fails to notify the public as to whether Dalanna had been checked periodically as required by the Texas Commission on Jail Standards, whether she had been ill, whether she was on medication, or whether there are any other issues related to her death.

125.    On September 14, 2020, 34-year-old Andre Wilson was found lying on the floor of his cell. The custodial death report lists the cause of death as Cardiomegaly, but fails to give any

details about what happened, whether he had been checked on periodically, whether he had been ill, whether he was on medication, or whether there are any other issues related to his death.

126.    On November 10, 2020, Kennie Craven was found unresponsive in his bed at the Tarrant County jail. He was later pronounced dead. The custodial death report lists the cause of death as heart disease, but fails to give any details about what happened, whether Kennie had been checked on periodically, whether he had been ill, whether he was on medication, or whether there are any other issues related to his death.

127.    On December 17, 2020, a Tarrant County jailer found inmate Jared Chapman hanging by a bedsheet from the ceiling of cell 41, but called for suicide assistance to cell 59. As the initial jailer was not at cell 59, the jailers had to yell to find each other. Once the backup jailer got to cell 41 and asked what was wrong, the initial jailer just pointed to Jared hanging in the cell. The backup officer immediately attempted to help Jared, but the initial officer "just stood there." Additional jail staff arrived thereafter but were unable to use their 911 Rescue Tool as it was already in use upstairs. Jared later died of his injuries.

128.    On December 19, 2020, Tarrant County jailers called a medical code for Lee Haney, who was complaining of shortness of breath, at 4:30AM. Around 6:15AM, medical staff called for an ambulance to take Lee to a hospital. Around 11:21PM, Lee was pronounced dead. The custodial death report lists the 34-year-old's cause of death as a pulmonary embolism, but fails to state whether Lee had complained previously, whether he had any history of blood clots or medical issues involving his lungs, or whether there are any other issues related to his death.

129.    On March 21, 2021, DeAnthony Taylor, who had a history of mental health problems, hypertension, hepatitis C. thyroid problems, and diabetes, was found unresponsive in his cell and was later pronounced dead at the Tarrant County jail. The custodial death report lists

the cause of death as heart disease, but fails to note whether he was on medication, whether he had complained to jailers, or whether there were any other issues related to his death.

130.   On July 20, 2021, Jeffrey Buchanan, who had a history of hyperthyroidism and hypotension and had exhibited mental health problems and made suicidal statements, but was housed in a multiple occupancy cell at the Tarrant County jail, was found having a seizure. After being transferred to medical and then a hospital, he was pronounced dead. The custodial death report lists his cause of death as cardiomegaly, but fails to state whether Jeffrey exhibited any warning signs of having a seizure, whether he had any history of seizures, whether any event or situation brought on the seizure, or whether there were any other issues related to his death.

131.   On August 15, 2021, Jeremiah Noble, housed in a single cell in the Tarrant County jail, was found hanging by a mattress over in his cell. A few days later, he was pronounced dead. The custodial death report does not state whether Jeremiah was on suicide watch, whether cell checks were completed in accordance with jail standards, or whether there were any other issues related to his death.

132.   On September 5, 2021, Tarrant County jail staff booked Tyler Huffman and discovered he was detoxing from unknown narcotics and had high blood pressure. Sometime after 10:00PM on September 9, 2021, Tyler died in his cell from heart complications. Jail staff found Tyler around 6:00AM, and EMS pronounced him dead at 6:41AM.

133.   On September 14, 2021, Georgia Baldwin, who had exhibited mental health problems and was housed in a single cell in the Tarrant County jail, was found unresponsive in her cell and was later pronounced dead. The custodial death report filed September 23, 2021 states that the cause of death is pending autopsy results. No amended report has been filed.

134.    On October 30, 2021, Leon Jacobs, who had known health issues, including Wolff-Parkinson-White Syndrome, chest pain, and shortness of breath, was pronounced dead. He was booked into the Tarrant County jail on September 14, 2021 and tested positive for COVID-19 on September 27, 2021, but was not taken to the hospital until October 6, 2021. The custodial death report filed November 9, 2021 states that the cause of death is pending autopsy results. No amended report has been filed.

135.    On January 1, 2022, Alvie Johnson, a man accused of killing his daughter, was found unconscious in his Tarrant County jail cell with a head injury possibly from a ground level fall. Alvie was taken off life support and pronounced dead a few days later. The custodial death report filed by the Tarrant County Sheriff's Office reports the cause of death as pending autopsy results and does not include any other information regarding how the death occurred, including whether he was on suicide watch.

136.    On February 25, 2022, Edgar Villatoro-Alvarez, who had exhibited mental health problems and was only 40 years old, experienced some sort of medical emergency at the Tarrant County jail and was later pronounced dead. The custodial death report filed by the Tarrant County Sheriff's Office reports the cause of death as pending autopsy results and fails to include any other details regarding how the death occurred, what medical emergency he experienced, whether he had been on periodic observation, or whether he complained or exhibits any signs that he needed emergency medical treatment.

137.    KERA News published an article on October 7, 2020 regarding deaths in the Tarrant County jail. The headline read, "Tarrant County Sheriff Bill Waybourn is running for re-election, and he's taking heat for the 10 inmates who died in his jail so far this year. COVID-19 is responsible for only one of those deaths." Shockingly, the second sentence in the article read,

"Waybourn attributes the increase to fate, and what he says is the relative ill health of the people who enter his jail." This does not pass constitutional muster. The article mentions Dean Stewart's death and the Tarrant County jail losing its state certification as a result. The article also mentions that, shortly after Mr. Stewart died, a prisoner actually gave birth inside of her jail cell, and no one knew about it. The baby died, and the mother was taken to a mental health facility. Her family said that she should have been in the mental health facility in the beginning.

III.     Causes of Action

    A.     14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

138.     In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him.  *Id.* at 2470.  The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable."  *Id.*  (emphasis in original).  The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant.  *Id.*  The Court did so, acknowledging and resolving disagreement among the Circuits.  *Id.* at 2471-72.  The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove."  *Id.* at 2472.  Instead, "courts must use an objective standard."  *Id* at 2472-73.  "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable."  *Id.* at 2473.  Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts

to analyze officers', or jailers', conduct on an objective reasonability standard.  Since pretrial detainees' rights to receive reasonable medical and mental health care, to be protected from harm, and not to be punished at all, also arise under the 14th Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

139.    Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for officers' or jailers' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment.  The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to constitutional claims in this case.  The court should not apply a subjective state of mind and/or deliberate indifference standard.  The Supreme Court discarded the idea that a pretrial detainee should have such a burden.

B.    Remedies for Violation of Constitutional Rights

140.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, Plaintiff individually and for and on behalf of all wrongful death beneficiaries and Claimant Heirs, seeks, for causes of action asserted in this complaint, all remedies and damages available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law.  If the decedent had lived, the decedent would have been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution and obtain remedies and damages provided by Texas and federal law.  Plaintiff incorporates this remedies section into all sections in this complaint asserting cause(s) of action.

C.    Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

141.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Individual Defendants are liable to Plaintiff individually, any other wrongful death beneficiaries, and to Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating the decedent's rights to reasonable medical/mental health care, to be protected, and/or not to be punished as a pretrial detainee.  These rights are guaranteed by at least the 14th Amendment to the United States Constitution.  Pre-trial detainees are also entitled to protection, and also not to be punished at all since they have not been convicted of any alleged crime resulting in their incarceration.

142.    Individual Defendants acted and failed to act under color of state law at all times referenced in this pleading.  They wholly or substantially ignored the decedent's obvious serious medical and/or mental health issues, and/or failed to protect him, and they were deliberately indifferent to and acted in an objectively unreasonable manner regarding those needs.  They failed to protect the decedent, and their actions and/or inaction referenced in this pleading resulted in unconstitutional punishment of the decedent.  Individual Defendants were aware of the excessive risk to the decedent's health and safety and were aware of facts from which an inference could be drawn of serious harm, suffering, and death.  Moreover, they in fact drew that inference.  Individual Defendants violated clearly–established constitutional rights, and their conduct was objectively unreasonable in light of clearly–established law at the time of the relevant incidents.

143.    Individual Defendants are also liable pursuant to the theory of bystander liability. Bystander liability applies when the bystander jailer/officer (1) knows that a fellow jailer/officer

is violating a person's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. As demonstrated through facts asserted in this pleading, Individual Defendants' actions and inaction meet all three elements. They are therefore also liable to Plaintiff, and other wrongful death beneficiaries, and Claimant Heirs pursuant to this theory.

144.   In the alternative, Individual Defendants' deliberate indifference, conscious disregard, state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to determination of constitutional violations set forth in this section of this pleading. The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers/jailers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause. *Id* at 2470-71. Constitutional rights set forth in this section of the pleading, and constitutional rights affording pretrial detainees protection against excessive force, all flow from the 14th Amendment's Due Process Clause. *Id.* Since such constitutional protections flow from the same clause, the analysis of what is necessary to prove such constitutional violations is identical.

145.   Individual Defendants are not entitled to qualified immunity.[1]  Their failure to protect the decedent, and other actions and/or inaction referenced in this pleading, caused,

---

[1]   The defense of qualified immunity is, and should be held to be, a legally impermissible defense. In the alternative, it should be held to be a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted. Congress makes laws. Courts do not. However, the qualified immunity defense was invented by judges. When judges make law, they violate the Separation of Powers doctrine, and the Privileges and Immunities Clause of the United States Constitution. Plaintiff respectfully makes a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited.

Individual Defendants cannot show that they are entitled to qualified immunity. This should be Individual Defendants' burden, if they choose to assert the alleged defense. Qualified immunity, as applied to persons not immunized under common or statutory law in 1871, is

proximately caused, and/or were producing causes of the Decedent's suffering and death and other damages mentioned and/or referenced in this pleading, including but not limited to those suffered by Plaintiff, any other wrongful death beneficiaries, and Claimant Heirs.

146.   Therefore, the decedent's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery from Individual Defendants:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses;

- the decedent's funeral expenses; and

- exemplary/punitive damages.

---

untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983. *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring). Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on Plaintiffs who suffer violation of their constitutional rights. Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that defendants violated clearly established law in only 2 such cases). Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity. *Schwartz, supra* at 1798–99. *See also Cole v. Carson*, _ F.3d _, 2019 WL 3928715, at * 19-21, & nn. 1, 10 (5th Cir. Aug. 21, 2019) (en banc) (Willett, J., Dissenting). Additionally, qualified immunity violates the separation of powers doctrine of the Constitution. *See generally* Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405 (2019) (available at https://repository.law.umich.edu/mlr/vol117/iss7/3). Plaintiff includes allegations in this footnote to assure that, if legally necessary, the qualified immunity abrogation or limitation issue has been preserved.

147.    Plaintiff and any other wrongful death beneficiaries also individually seek and are entitled to all remedies and damages available to each such person individually for 42 U.S.C. § 1983 claims.  Ms. Miller seeks such damages as a result of the wrongful death of her son.  Those damages were caused and/or proximately caused by Individual Defendants.  Therefore, their actions caused, were a proximate cause of, and/or were a producing cause of the following damages suffered by these people, for which they individually seek compensation:

- loss of services Ms. Miller would have received from the decedent;

- expenses for the decedent's funeral;

- past mental anguish and emotional distress suffered by Ms. Miller resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by Ms. Miller resulting from and caused by the decedent's death;

- loss of companionship and/or society, as applicable, that Ms. Miller would have received from the decedent; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of the decedent's constitutional rights.  Individual Defendants' actions and inaction showed a reckless or callous disregard of, or indifference to, the decedent's rights and safety. Moreover, Plaintiff individually and on behalf of any other wrongful death beneficiaries and Claimant Heirs seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

D.    Cause of Action Against Tarrant County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

148.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant Tarrant County is liable to Plaintiff,  any other wrongful death beneficiaries, and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating the decedent's rights to reasonable medical/mental health care, to be protected, and/or not to be punished as a pre-trial detainee.  These rights are guaranteed by at least the 14th Amendment to the United States Constitution.  Pretrial detainees are entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration.

149.    The County acted or failed to act, through natural persons including Individual Defendants, under color of state law at all relevant times.  The County's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of the decedent's suffering, damages, and death, and all damages suffered by Plaintiff, any other wrongful death beneficiaries, and Claimant Heirs.

150.    The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege the appropriate chief policymaker at the pleadings stage.  Nevertheless, out of an abundance of caution, the sheriff of the County was the County's relevant chief policymaker over matters at issue in this case.  Moreover, in addition, and in the alternative, the County jail administrator was the relevant chief policymaker over matters at issue in this case.  Finally, in addition, and in the alternative, the County's commissioners' court was the relevant chief policymaker.

151.    The County was deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to issues addressed by allegations set forth above.  It

also acted in an objectively unreasonable manner.  Policies, practices, and/or customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of the decedent's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur.   The County's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to the decedent.

152.   Therefore, the decedent's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery from the County:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses; and

- the decedent's funeral expenses.

153.   Plaintiff and any other wrongful death beneficiaries also individually seek and are entitled to all remedies and damages available to each such person individually for the 42 U.S.C. § 1983 violations.  Ms. Miller seeks such damages as a result of the wrongful death of her son. The County's policies, practices, and/or customs caused, were proximate and/or producing causes of, and/or were moving forces behind and caused the following damages suffered by these people, for which they individually seek compensation:

- loss of services that Ms. Miller would have received from the decedent;

- expenses for the decedent's funeral;

- past mental anguish and emotional distress suffered by Ms. Miller resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by Ms. Miller resulting from and caused by the decedent's death; and

- loss of consortium, companionship, and/or society, as applicable, that Plaintiff and Ms. Miller would have received from the decedent.

Moreover, Plaintiff individually and on behalf of any other wrongful death beneficiaries and Claimant Heirs seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

## IV.     Concluding Allegations and Prayer

### A.     Conditions Precedent

154.    All conditions precedent to assertion of all claims herein have occurred.

### B.     Use of Documents at Trial or Pretrial Proceedings

155.    Plaintiff and Claimant Heirs intend to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

### C.     Jury Demand

156.    Plaintiff and Claimant Heirs demand a jury trial on all issues which may be tried to a jury.

### D.     Prayer

157.    For these reasons, Plaintiff asks that Defendants be cited to appear and answer, and that Plaintiff, any other wrongful death beneficiaries, and Claimant Heirs have judgment for damages within the jurisdictional limits of the court and against all Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and below in this pleading:

a)      actual damages and including but not necessarily limited to for:

- loss of services that Ms. Miller would have received from the decedent;

- medical expenses for the decedent;

- expenses for the decedent's funeral;

- past mental anguish and emotional distress suffered by Ms. Miller resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by Ms. Miller resulting from and caused by the decedent's death;

- the decedent's conscious physical pain, suffering, and mental health anguish;

- the decedent's loss of life and/or loss of enjoyment of life; and

- Ms. Miller's loss of companionship and/or society, as applicable;

b)      exemplary/punitive damages from Individual Defendants (Mr. Gay and Mr. Kirk);

c)      reasonable and necessary attorneys' fees through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

d)      court costs and all other recoverable costs;

e)      prejudgment and postjudgment interest at the highest allowable rates; and

f)      all other relief, legal and equitable, general and special, to which Plaintiff, any other wrongful death beneficiaries, and Claimant Heirs are entitled.

Respectfully submitted:


Law Offices of Dean Malone, P.C.


　　　　/s/ T. Dean Malone　　　　
T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:　(214) 670-9989
Telefax:　　(214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Kristen Leigh Homyk
Texas State Bar No. 24032433
kristen.homyk@deanmalone.com
Brandie A. Moser
Texas State Bar No. 24123223
brandie.moser@deanmalone.com
Jordan A. Shannon
Louisiana Bar No. 37868
jordan.shannon@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:　　(214) 670-9989
Telefax:　　　(214) 670-9904

Attorneys for Plaintiff